## DOUGLAS PECTIN CORPORATION v. ARMOUR & CO.

(District Court, W. D. New York. July 20, 1926.)

**1. Patents ⬅➡328.**

Douglas patent, No. 1,082,682, December 30, 1913, for a concentrated compound containing soluble pectin for jelly-forming substances, *held* invalid for anticipation.

**2. Patents ⬅➡328.**

Douglas patent, No. 1,235,666, August 7, 1917, for jelly-making product clarified by use of diastatic enzym and the process of making it, *held* valid and infringed.

**3. Patents ⬅➡328.**

Douglas patent, No. 1,304,166, May 20, 1919, relating to decreasing of boiling time for fruits in making jelly by use of concentrated pectin, *held* invalid for anticipation.

**4. Patents ⬅➡118.**

Patents involving a jelly-making product of concentrated pectin and means for making and using it *held* sufficiently definite, under Rev. St. § 4888.

**5. Patents ⬅➡36.**

Commercial appreciation of invention is persuasive of its patentability.

In Equity. Patent infringement suit by the Douglas Pectin Corporation against Armour & Co. Decree for plaintiff for part only of relief sought.

Frederick F. Church, and Arthur E. Sutherland, both of Rochester, N. Y., for plaintiff.

Louis L. Babcock, of Buffalo, N. Y., and William Nevarre Cromwell and A. B. Stratton, both of Chicago, Ill., for defendant.

HAZEL, District Judge. This is a suit in equity, alleging infringement by defendant Armour & Co. of three letters patent, all relating to fruit products and the process for making jellies, jams, and preserves. The first two patents were issued to Robert Douglas and assigned by him to the plaintiff, while the third was granted to the latter directly. No question of title arises. The first patent was granted as No. 1,082,682, December 30, 1913; the second, No. 1,235,666, August 7, 1917, for a jelly-making product, the process covering a pectous concentrate, and specifically a treatment for removing the starch naturally dissolved; while the third, No. 1,304,166, May 20, 1919, relates particularly to decreasing the boiling time of the fruits.

The defenses relied on are invalidity, noninfringement, and prior use, based upon the following grounds: (a) That patentable subject-matter is absent; (b) public use by others for more than two years before the invention; (c) anticipation; and (d) failure to set forth the invention in exact terms, so as to enable the skilled in the art to practice the same.

[1-4] Throughout this trial the case, on both sides, has been treated as one of great public importance; the plaintiff claiming that the patents have revolutionized the jelly and jam making industry, and that the patents are in the pioneer class. The record is voluminous, comprising 1,600 pages and many depositions taken out of court, at the instance of the defendant, to prove prior use in different parts of the United States.

To make jams and jellies from fruit juices in the home by boiling and evaporating the fruit or juice with the sugar content to coagulate the mass, or allowing the particles of fruit to remain in the boiled, transparent mass for making jams, has been a well-known method for more than a century. The custom of boiling ripe fruits, or the skins and cores of apples, by the housewife, which often required reboiling in order to obtain the evaporation, so as to combine the

pectin and sugar content as jelly, gave way, as plaintiff claims, to a more systematic boiling process and treatment, with the result that the product boils more rapidly and less expensively, looks brighter, and is known to retain its fruit color, aroma, and taste—something the old product retained in a limited way only.

The patentee claims to have been the first to isolate from fruit its jellifying material—a substance peculiarly adapted for making jellies, jams, and preserves, which he calls a concentrated pectin. The concentrate is a viscous substance of certain strength and clearness, and, according to the specification, is preferably made of apples or apple waste from which the larger part of the natural sugar has been removed, to estop the pectin (a jellifying constituent) from jellifying itself, and forms, without prolonged boiling, a jelly with sugar and water, or jam by mixing with fruit particles. Making jams and jellies commercially has become very extensive, and, if plaintiff's product constituted an invention, it became of great importance in this industry.

To carry out his conception, the patentee asserts that at various times in 1909, and the spring of 1910–11, he experimented with apples and their skins and cores, by extracting from the residue pomace an isolated fruit pectin. He desugared the pomace, or ground apple substance, to transform it into a concentrate of pectin, and ascertained that, upon mixing the same with a variable quantity of sugar and fruit juices or mashed fruit in the juices, and adding thereto a small quantity of acid, when such addition was deemed necessary, that jellies or jams, respectively, were formed. In other words, he asserts and claims that by simply cooking apples or their waste, from which the saccharine juice had previously been taken, and then expressing the juice, a pectin concentrate or extract was formed, to which he gave the name of "Certo," selling the same in large quantities, as the proofs show, to canners, and in small quantities, in bottles, to individuals.

The specification states:

"Jelly-forming substances may be obtained from various fruits or vegetables, and I prefer to employ apples as the source of the product on account of their cheapness, the ease with which they may be handled, and the comparatively large content of pectose substances which form constituent elements of this fruit. The latter may be treated in various ways to yield the pectous or jelly-forming substance, preferably by processing the fruit pulp after the fruit juices have been expressed from the raw fruit to remove the saccharine juices, or natural sugar. This removal of the saccharine juices may also be accomplished by the process of diffusion with water. The fruit pulp thus prepared is then treated with a suitable solvent, such as hot or boiling water, to which may be added a small proportion of any suitable acid. The addition of the said acid is not at all times necessary, and depends largely upon the degree of ripeness of the fruit or its acidity, and I only deem its use desirable in comparatively small quantities, for the purpose of assisting in liberating the pectous properties of the fruit from the pulp. The treatment of the fruit pulp, it will be understood, may be carried on in any suitable form of vessel, or it may be treated in a digester and the processing done under pressure."

The elimination (as nearly as possible) of the natural sugar of the fruit or of the pomace from which the pectous substance was produced—a neutral product, as counsel for plaintiff called it—was the patentee's primary object, and it is contended that neutralization was essential to keep the pectin, because of the fruit sugar therein, from jellifying or hardening itself.

The first patent has four claims, all of which are herein involved. The third relates to the product, and the fourth to the process. They read as follows:

"3. A concentrated compound of the character described, consisting of a syrupy, viscous liquid, which contains soluble pectins or jelly-forming substances of fruit or vegetable origin, besides other characters derived from the raw material, such as small amounts of residuary sugars, acid, and mineral matters, its essential characteristic being its property of forming a jelly when combined with definite proportions of sugar and water.

"4. The process of producing an unsolidified pectus compound, consisting in treating a fruit or vegetable to remove the natural sugar therefrom, processing the remaining pulp in the presence of a solvent to extract the pectose substances, and reducing the liquor thus obtained by evaporation to a syrupy concentrate."

These claims are attacked by defendant for indefiniteness and variance from what is shown in the specification, and, accordingly, it is argued that the first and third patents do not distinguish from the prior state of

the art, and infringement cannot be predicated because defendant makes its product in accordance with old methods. But I do not think the criticism of indefiniteness is vital. The whole description, read with the claims, to my mind, makes fairly clear that the patentee designed to produce a fruit article possessing certain characteristics, to wit, a viscous, concentrated pectin having a certain consistency, from which the greater part of the saccharine juices or natural sugar has been removed, so that it becomes reduced without jellification, and a jelly may form upon the addition of a certain amount of sugar and water.

It is argued that the claims do not state the essential characteristics by which the pectin concentrate is formed, in that exact proportions of sugar and water are not stated. As to this, objection, it suffices to say that specifications are addressed to the skilled in the art, and the patentee was warranted in assuming that persons manufacturing the article would understand what was meant by the terms "to remove the natural sugar," or the greater part of the natural sugar, or that the fruit shall be "nearly devoid of natural sugar," without the precise proportions being given, and that by processing or boiling the pulp in water, "to extract the pectous substance," the liquor would be reduced by evaporation to a viscous concentrate or substance incapable of jellification. American, etc., v. Ludlum Steel Co. (C. C. A.) 290 F. 103. It is also maintained that the description vaguely implies a two-step process, instead of one, to remove the natural sugars from the fruit. To support this argument, reference is made to the second patent, wherein it is said that the pulp is first pressed for making cider from apples, and the remaining pulp is processed by diffusion in water, accompanied by a second squeezing of the pomace.

The objection is believed to be superficial, since it is shown that by removal of the fruit sugar, either by expression or by diffusion of the fruit, the patented result was achieved. To my mind the first patent is a sufficiently clear and exact compliance with section 4888, R. S. The expert witnesses apparently disagree on this point. Mr. Zimmerman says that he thought the first patent described two steps for producing the concentrate, namely, the removal of the juice by pressing the pulp to eliminate the sugar content, followed by boiling the juices without extracting the pectin, then evaporating the water to put the substance in concentrated form, while Prof. Bancroft avers that the saccharine juices are removed either by expression or diffusion in water, and the pectin by treatment with hot or boiling water, adding thereto the needed quantity of acid before cooking to desugar.

The phrase "to remove the saccharine juice or sugar from the pulp after the fruit juices have been removed by crushing or squeezing," standing alone, perhaps implies a two-step process; but in other parts of the description explanatory terms are used, as, for example, "nearly devoid of sugar," and "the removal of the greater part of the natural sugar." This would seem to imply removal of the greater part of the natural sugar from the pectous liquor pressed from the pulp, so as to prevent jellification when concentrated. Even if it be assumed that more than one method of extracting the pectin is suggested, the claims in this relation contain no limitation, and, accordingly, a two-step process was not in contemplation of the patentee. Sewall v. Jones, 91 U. S. 171, 23 L. Ed. 275. If the directions contained in the description are carefully followed, then, notwithstanding some degree of indefiniteness as to quantities of sugar and water, or kind of acid, or boiling period, the object of the patentee will, no doubt, be attained. The question of the validity of the patent must await the conclusion reached on the evidence of prior use.

The second patent, granted one year and four months after the first, is limited to a treatment of the pectin concentrate, by which its turbidity or cloudiness is removed by separating the starch and tannin, which were in complete solution in the weak liquor before concentration, and which, as plaintiff's testimony indicates, were not perceptible. The separation of the starch and tannin was finally accomplished by the use of a diastatic enzym, which changed the starch into carbohydrates like maltose, which then arrested precipitation; it then being unable to combine with the tannin. Any lack of accuracy in the description of the second patent, relating to the method of making the concentrate, does not modify or alter the description in the first patent. It cannot be construed to include the product or process of the first patent.

The claims in controversy are 10 in number, but claims 3, 4, and 5 are fair examples of the others:

"3. A pectous concentrated compound,

from which most of the natural sugar and soluble starch is removed, and which is then reduced in volume.

"4. A substantially starch-free viscous concentrated liquid containing soluble pectins, obtained from vegetable material, having as an essential characteristic the property of forming a jelly when combined with definite proportions of sugar and water, and a further essential characteristic the lack of a cloudy precipitate.

"5. The process of producing a pectous compound, consisting in treating a vegetable material to remove the natural sugar therefrom, processing the remaining pulp in the presence of a solvent to extract the pectous substances, treating the pectous liquor to remove dissolved starch therefrom, and subsequently concentrating the liquor thus obtained."

The patentee's contribution to the art at this time consisted in the ascertainment that the cloudiness of the concentrate therein described was due to the presence of starch and tannin in the fruit, which had chemically combined, and that, by using a diastatic enzym, clarification of the product was obtained. No claim is made for the conversion of starch into sugar by a diastase; but the means adopted for preventing a cloudy precipitate in the concentrate was a new and novel improvement, as I think the proofs show. It was not an obvious expedient, since resort was had to various experiments before discovery that the cloudiness was due to the combination of the two constituents contained in the liquor. It was discovered that, by converting the soluble starch into sugar by the diastase, it would separate from the tannin and dissolve in the sugar, resulting in clarification.

Defendant attaches importance to the publication of Dr. Brown's Bulletin No. 58 (Exhibit 15), and to his testimony to negative invention. It is true that the bulletin indicates that the starch content of apple is subject to dissolution by action of a diastatic enzym; but the evidence bearing on this subject shows that the starch and tannin were in solution, and its injurious presence was discovered only by experimentation and application of enzym, which finally eventuated in the exercise of invention. Dr. Brown stated that his experiments were entirely upon cold apple pulp, and he made no tests on boiled solution of any kind; that he was unable to give an opinion as to what the effect of enzym would be on boiling pulp concentrate from solution; nor, indeed, was he aware of the effect of tannin and starch combined in a pectous solution.

Dr. Thomas, an expert on enzyms, and Mr. Bender, a chemist, however, unequivocally testified that it was not a simple matter to separate the starch from tannin and to convert it into sugar, to remove the turbid appearance of the concentrate. On this point Dr. Thomas testified that he would have assumed the precipitate to be decomposed pectin, and would not suspect the concentrate to contain starch and tannin in combination; that he regarded the patent by which a diastatic enzym was used for clarification of the product to be new to the science of chemistry. Nor am I satisfied that the mere use of the iodine test, as defendant contends, would have suggested either the cause of the cloudiness or employment of an enzym to remove it.

The draftsman of the specification failed to clearly include the method in the second patent by which the fruits were reduced to the concentrated liquid, but this is not believed of material importance in view of the limitation of the claim to the specific treatment.

The third patent, which also relates to practicing the process, in its essence consists in lessening the boiling operation for producing jams and jellies by using the concentrated pectin. In making the product in the home and in manufacturies, the required boiling period often dissipated the flavor and aroma of the fruit and destroyed its color, and the patent designed to treat the boiled mass so as to sterilize it, without evaporation resulting from prolonged boiling.

By the date of application for patent, August 14, 1913, it appears that the conception and discovery in suit was made during the experiments which resulted in the application for the first or parent patent, or while the first application was pending. Under the Patent Office rules separate patents were required, because the first application covered a process for making a pectin concentrate, and the later covered the food article. Infringement of all the claims is contended, but claims 1 and 5 are typical of the others, and it will suffice to set them forth:

"1. A jellified conserve, composed of crushed fruit, sugar dissolved in the fruit juice, and a concentrated pectous solution of sufficient strength to combine with the sugar and surplus water of the fruit, to jellify

the mass without material reduction of volume by evaporation.''

"5. The process of making fruit jellies, consisting in adding to fruit juice a given quantity of sugar and a proportional quantity of concentrated fruit pectins, sufficient to jellify the mass without prolonged boiling.''

Reference, of necessity, is made in the description to the pectin concentrate; but the improvement with relation to the elimination of prolonged boiling and the advantages therefrom is emphasized. Assuming at this time the validity of the patent, there is no attempt made to go beyond the scope of the earlier claims, even though, as defendant claims in its brief, in the first patent the words "fruit juices for making jelly" are used, while in the patent now considered the words "fruit pulp for making jam and conserve" are given significance. The real object of the patentee was to estop the necessity of prolonged boiling in manufacturing the pectin concentrate. There is no necessity, it seems to me, of following defendant in its analysis of the various claims, inasmuch as the patent cannot be construed to include the process of the first patent or the product. It covers simply the use of the compound in the production of the articles. I am of opinion that the claim of indefiniteness is unsubstantial.

Before the third patent was issued, and after filing his application, Douglas spoke of it at a convention of chemists, calling it a short-boil process of making jellies and jams, with the result that four days later Dr. Straughn, who was present at the convention, filed an application for a similar patent, claiming to have been the original inventor of the short-boiling method. Interference with the application in suit was declared, which, however, resulted in rejecting the interfering application and awarding priority to the patentee herein. Subsequently plaintiff's application again came into interference with the Whitaker patent, No. 1,182,517, claim 6 in suit being involved, and, after taking testimony, priority of invention was again awarded to the patentee.

Defendant's general argument is that, as the process by which the pectous solution is concentrated eliminates the moisture content of the solution admixed with other ingredients, it has a tendency to decrease the evaporation, and no invention was involved. The specification for practicing the invention clearly points out that, when the fruit or fruit juice for making the product is mixed with a slightly larger proportion of sugar than was required in the usual practice of boiling, and the pectin added, and the mixture heated to a sufficient temperature to dissolve the sugar, the product becomes sterilized, and then, according to the specification, the quantity depends upon the concentration and the richness of the pectous properties. But in the prior use processes, to which reference will shortly be made, there was employed a short-boiling method which I think is anticipatory.

There is much evidence relating to the utility and novelty of plaintiff's product. Exclusive rights under the patents were sought by manufacturers, to whom sales were made in large quantities. The defendant, also, in 1918, plaintiff claims, through its agent, Davidson, solicited a license and suggested consolidation of its business with plaintiff's. It is not shown that Davidson had authority to negotiate consolidation of the businesses, and the testimony may, as moved by defendant, be stricken out. Plaintiff claims that its product has revolutionized the jelly and jam marking art—a new industry for the first time using pomace, the residue after extraction of the cider. Continuously from 1913, when plaintiff began the manufacture of the pectin concentrate, sales in this country and abroad have been increasingly large. The material is freighted to manufacturers in cans or packing cases, and sold by grocers in bottles labeled "Certo."

[5] Commercial appreciation of an invention is often persuasive in deciding the question of patentability. This rule of patent law, no doubt, is applicable, unless it is true, as defendant insists, that, notwithstanding the approval and success achieved in making sales, the prior art and publications, and prior use for more than two years before the invention, renders the patents invalid for lack of novelty and originality.

Thus far this court has treated of the patents, their character, and of certain objections urged against their validity. It is now necessary to treat of asserted anticipatory patents and publications, and of prior public use. Books and excerpts were received as bearing upon the state of the art. In Bulletin No. 58, Dr. Brown tells of disposing of the pomace of apples by re-pressing it and adding thereto water in small amounts; that the juice be given a second pressing for jelly evaporation or vinegar stock; that when jelly is made from the

second pressing it is usually lighter and firmer than when made from the first pressing. Bulletin No. 94 (Exhibit 19), published by the United States Bureau of Chemistry, suggests to the art that concentrated pectin could be formed for making jellies and jams from fruit, or about cooking the pomace to extract the natural sugar, or pressing the pomace to desugar the pectin. The British patent, No. 4,276, to Scott & McDonald, states that pectin may be made into jelly; but it is not shown or suggested how the pectin is to be extracted from the fruit.

Nor are the patents to Jefferies, dated December 3, 1912, and to Boyle, in 1913, anticipatory. In the Jefferies patent, it is true, it appears that jelly may be made from skins and cores of apples, upon treating the pulp in a closed vessel under steam pressure, pressing the boiled fruit, and extracting the juice for making jelly—a close approximation to the first and third patents in suit. Nothing is said of concentrated pectin, to be used separately as a commercial article and for use by others in making the product. Although they are not anticipatory, they nevertheless have a bearing upon the state of the art. In all some 40 witnesses were sworn to prove that the processes of the first and third patents in issue were old; that the method of using the pomace of apples, after pressing out the cider, to make a jelly concentrate, and using the apple waste, skins, and cores, was familiar to the skilled in the art, and pectin concentrates had been used, long before the Douglas conception, for making jams and jellies.

In dealing with this subject, I begin by referring to Bender's testimony, wherein he described in detail the patented processes and practices in making the product. Raw apples, he substantially testified, were finely ground and tightly pressed in cider presses, to squeeze out the juices, and the remaining pomace, after its use for cider, was soaked with one-half its weight in water for an hour or so, and then again squeezed or processed; the fruit from both pressings being then mixed to make vinegar. The pomace left over was steam-cooked in a tank containing acidulated water, about 30 minutes, to impart to the water a small acid content—enough acid so that the mass would be from $13/100$ to about $20/100$ of 1 per cent.—and then cooked with live steam for 30 or 40 minutes. The cooked or boiled mass was then wrapped in press cloths and laid on large presses to squeeze out the pec-

tous liquor, which was then allowed to stand from 3 to 5 days, to enable it to partly clear by settlement of the sediment, before drawing off the liquor or juice and evaporating it to concentrated form containing enough sugar to form a jelly. (The starch precipitate was not enzymed until the end of 1913.) Waste or dry cores and skins were immersed in a tank of water, permitted to stand for several hours, and, after soaking, the sweet juices were drawn off, and fresh water added to leach or diffuse the material, until the saccharine juices were removed to make vinegar. Then, after removing the sweet liquor from the wet pulp, it was used to make the pectin concentrate by cooking, adding acid, and pressing out the liquor, as was done with raw apples.

Had the witness Clymer and others, prior to 1910, made jellies and jams in substantially the same way? Clymer testified that, in using currants for jelly making, he immersed them in a tank of lukewarm water and allowed them to soak for a time, and then the juice was extracted from the currants for making jellies. It was boiled down in containers for future use, and the pulp was made into jam. Apple jelly, he said, was made in substantially the same way as jelly from currants, save that the pulp was put into a cooker, boiling down from 3 to 6 degrees Baumé, and, after adding water, was brought to a pressure; the pulp was then pressed and the juice used for jelly directly, or stored for future use in jelly making. In 1902, 1903, and 1904, he made jelly from apples, by first putting the apples in an open vat containing a steam coil, using steam to mash the apples, and then the mash was pressed to extract the juice. The pulp was used for apple butter. In 1908, however, the apples were first chopped and cold pressed, the cider taken off and boiled down, the remaining pulp again pressed in a tank of water, and juice extracted and boiled down, either for immediate jelly making or for storing for future use. The pulp was discarded, but in 1908 the pulp, from which the juice was extracted, was put in the pressure tank with warm water and screw-pressed for obtaining the remaining juice, from which jelly was made, or boiling down from 3 to 5 degrees Baumé to keep for later use. After cooling, the juice was of syrupy consistency and did not jellify of itself.

The witness Hausman corroborated Clymer in the specified method, and also testified that in making cider the cut-up apples

were cold-pressed, the remaining pulp cooked for making cider, and, after the cider had been removed, the pulp or pomace was again pressed and boiled down for jelly stock, either for immediate or future use in making jelly. The consistency of the juice, he said, was syrupy and would not jellify itself, and the boiled-down jelly juice was kept in storage from one season to another, and, on using it for apple jelly or fruit jelly, was found in practically the same condition, aside from the presence of sediment. He also testified that the apple pomace, after extracting the cider, was processed, put into a tank, water added, boiled, pressed, and the liquor resulting from the process was concentrated liquor. I find that Clymer's treatment was substantially similar to the method by which plaintiff's pectous solution is produced and concentrated.

Plaintiff criticizes Clymer's and Hausman's testimony, and contends that what they did were experiments only, and the testimony was too remote for consideration. It is argued that, while he boiled down the juices to a jelly consistency, he did not, in fact, make the product; that the currants were not crushed or desugared. It is true the word "experiment" was used, but it was used loosely, for Clymer plainly stated that the recorded formulæ of August 21, 1906, and September 10, 1908, were regularly practiced in the business. It could scarcely be expected that he would keep a detailed record of the operations, or as definitely as he would, had he supposed that the record would be used to corroborate his recollection. The entries tend to support his recollection regarding the boiling down of the cider from cut apples, the recooking of the pomace, after extracting the cider, by pressing it in a tank or digester containing warm water, and again pressing the juice and keeping it in jars for future use. The effect of his treatment was to crush the currants and desugar the mass. His method of treating the left-over pulp or pomace with the solvent action of heated water, and pressing out the juice, was, in my opinion, a fair equivalent of the Douglas processes and product, as set forth in the first and third patents.

It was also satisfactorily shown that one Andrews, who for many years had been engaged in the manufacture of james and jellies, practiced a method at times which, I think, was similar to plaintiff's. The juice of the fruit was extracted under pressure and sugar added thereto, which was then boiled until the desired viscosity was obtained. He cooked or boiled the fruit, omitting, however, to extract the juice, and used the pomace, adding sugar, and then boiling the mass. He got a pectin concentrate of apple juice by boiling the apples, expressing the juice, and then evaporating it to desired consistency. He added water, equaling 10 per cent. to 25 per cent. of the weight of the fruit, before cooking, pressing, and squeezing through press cloths. These occurrences, he testified, extended from 1882 to 1893. Subsequently, but before the invention in suit, he manufactured sweet cider, and then experimented by adding quantities of sugar to the apple juice to make jelly, and ascertained that the left-over pomace, upon squeezing out the juice, possessed jelly-making properties. He mixed the juice of the pomace, boiled down the mass, pressed it, added a suitable weight of water to the extracted juice, boiled the pomace and water, again pressed it, and made jelly, but the flavor of the apple was absent. His concentrate of light, syrupy consistency was put in glass jars and kept to make a second grade jam or jelly. It did not jellify of itself and to cause jellification fruit juice and sugar were added. He produced a deed and a release and a record book containing entries by him of the date of his manufacture.

Hoelzer, an employee, gave corroboratory testimony, and told of using apples and apple waste and pomace, pressing out the juices, and boiling with sugar and a water solvent to make jelly. The left-over juice, he said, was condensed in a vacuum kettle to boil it down, from 1902 to 1905, and the concentrate stored in containers for future use. The solution was viscous, and would not jellify of itself, and he referred to formulæ and books as to the date when the method was employed. The Andrews uses were not merely experimental, even though subsequently pectin concentrate was bought of plaintiff, since he testified that he had not the facilities for making enough concentrated apple juice to fill his requirements.

The Kuehne use also consisted of an extraction of juices from apple pomace and skins and cores for making jams and jellies from 1893 to 1909. The juice from the pomace, after making cider, was pressed, boiled, and kept for future use in making jellies and jams. The boiling of the juices was down to a degree from 10 to 15 Baumé —a short boiling. It was also shown that, in producing the jelly from the concentrate or

apple juice, sugar or glucose was admixed with added juices to impart flavor. In making the product enough heat was applied to bring it to a boiling point. The jelly from the juice or concentrate, which was packed in glass jars, was clear and solid. The testimony of Kuehne as to essentials was fairly corroborated by Neff and Krantz, who were employees. Reference was made to an inventory sheet upon which several sales of jelly juice are noted in 1908—other records having been destroyed by fire.

The Kuehne use is criticized for indefiniteness as to dates, that the inventory record is not sufficiently authenticated, and that, in fact, a desugared concentrate was not produced. The years, however, prior to the invention, are fairly established. The juices taken from the apple or apple waste at the Kuehne plant constituted a pectin solution, regardless of whether the witnesses fully realized its value, or the extent to which the juices, when concentrated, might be commercially used. The evidence of admixture with definite parts of sugar and liquid juices to form the jelly is also fairly clear and explicit. That Kuehne, subsequent to 1915, bought pectin concentrate from plaintiff, is not of sufficient importance to warrant rejecting this evidence.

The Sprague & Warner process for making jellies involved so-called cold or hot methods. In the former the concentrated juices were mixed with sugar and water, while in the latter, the apple juice concentrate, its density was reduced with water and sugar and boiling. It is unnecessary to follow the process, save to state that jelly was made by the cold process from pectous concentrate and sugar and water, without prolonged boiling, prior to the patents in suit. The extracted juice or liquor was not desugared, and yet the evidence shows that concentration resulted without the substance jellifying itself.

There was also testimony that Williams Bros. & Carbonneau, later Williams Bros., at their factory made jellies from glucose and the juice of apple waste and apple pomace as early as 1885 and in 1892. The pomace was used after first expressing the cider. It was put in a tank, and soaked with water, and boiled with live steam, the cider pressed out, and then pressed again for juice in making jelly, which was clear and marketable. This method substantially corresponded to the Douglas method of desugaring and extraction of the pectin concentrate. Douglas was in the employ of this firm in 1891 and 1892, while apple juice was extracted from pomace, and observed the treatment of the skins and cores in making a jelly base.

The Pillman use also shows the extraction of juice from pomace on a second pressing, and a treatment which resulted in getting a syrupy concentrate for making the product.

The testimony of Crawford shows that in October or November, 1910, juice was pressed from pomace after desugaring and boiling it, and used for making jellies and jams. In this condition the liquor was a concentrated pectin solution, which would not jellify itself.

Plaintiff contends that the Crawford disclosure or practice, and the recited conversations with Douglas in relation thereto, were after the conception and completion of the process in suit; but the fact that the first patent was not applied for until nearly three years later is not without significance, and generates a doubt as to the recollection of plaintiff's witnesses, upon whose testimony reliance is placed to antidate the invention.

The evidence of prior public use is very voluminous, and it is idle to further enlarge upon it. It has not been discredited or impeached, and fairly comes within the rule of the Barbed Wire Case, 143 U. S. 275, 12 S. Ct. 443, 450, 36 L. Ed. 154. In nearly all instances the prior processes were the result of independent endeavor, some following one method, a single press removal of pomace, and some a double press, but always their own method and formula; each accomplishing a removal of the natural sugar from the pomace after extraction of cider, and getting a pectous solution and some a concentrate. It is difficult to particularize in what respect the steps of plaintiff's process are different from the methods of the prior uses, since they were substantially the same in the instances to which reference has been made, as the chart at the end of defendant's brief tends to show.

The testimony of various manufacturers of jams and jellies, that the prior uses with which they were familiar were essentially different from plaintiff's, has not been overlooked; but, nevertheless, I think the evidence of defendant's witnesses as to prior uses outweighs the former and are anticipations. The Douglas process (except the second patent), though resulting in a better article, was "a mere carrying forward, or new or more extended application,

of the original thought, a change only in form, proportions, or degree. The substitution of equivalents, doing substantially the same thing in the same way by substantially the same means, with better results, is not such invention as will sustain a patent." Smith v. Nichols, 21 Wall. 112, 22 L. Ed. 566. And, in the light of what the prior uses show, the step in advance, the changes as to details or minor modifications, were within the province of the skilled in the art, and, accordingly, were devoid of invention. Berlin Mills Co. v. Procter, 254 U. S. 156, 41 S. Ct. 75, 65 L. Ed. 196.

My conclusion is that the patent to Robert Douglas, No. 1,082,682, dated December 30, 1913 (application filed May 19, 1913), and patent No. 1,304,166, to the same inventor, assignor of Douglas Packing Company, Inc., dated May 30, 1919 (application filed August 14, 1913), are anticipated by the prior uses to which attention has herein been drawn. The patent to Robert Douglas, No. 1,235,666, dated August 7, 1917 (application filed April 12, 1915), is held valid and fringed by defendant Armour & Co., since the evidence shows that starch and tannin are removed by its product by the use of a diastatic ènzym, which operated to convert the starch, and prevents or clears its concentrate from a turbid solution. The claims which do not specifically include the treatment by which the cloudy precipitate in plaintiff's product is eliminated are construed to include such treatment.

Decrees may be entered in accordance with this opinion, with two-thirds costs to defendant.