## ASHCRAFT v. NATIONAL THEATRE SUPPLY CO. et al.

### No. 4504.

Circuit Court of Appeals, Fourth Circuit.

Jan. 9, 1940.

Samuel E. Darby Jr., of New York City (Cook & Markell, of Baltimore, Md., and Darby & Darby, and Floyd H. Crews, all of New York City, on the brief), for appellant.

Clair V. Johnson, of New York City (J. Calvin Carney, of Baltimore, Md., and L. A. Watson and E. R. Helferich, both of New York City, on the brief), for appellees.

Before PARKER and SOPER, Circuit Judges, and DOBIE, District Judge.

SOPER, Circuit Judge.

This appeal was taken from a decree dismissing the bill of complaint in a suit for infringement of United States patent No. 1,983,430, issued December 4, 1934, to Clarence S. Ashcraft on an application filed April 16, 1934. The patent relates to a method of producing an electric arc for use in motion picture projectors, search lights, &c. It has been common practice in the art for many years to produce such an arc by sending an electric current through a pair of carbons disposed adjacent to each other end to end, but separated by a small gap. The arc is formed when the gap is spanned by the flames produced by the current in the ends of the carbons as it proceeds from the negative to the positive carbon.

Prior to 1933 two types of electric arc were in general use in the motion picture industry, the low intensity arc and the high intensity arc. In the production of the low intensity arc, comparatively large carbons,

a little over ⅝" in diameter were customarily used. They were composed of carbonaceous material with a small core of arc sustaining but not light emitting material. The carbons were disposed horizontally and coaxially, end to end, and the arc gap between them was comparatively small, i.e., about ⅜". A small current was used, e.g. 25 amperes, and the light was produced by the glowing end of the positive carbon to which the flame from the negative carbon proceeded across the gap. The current density was small, and the light produced had a yellowish color which was not best adapted for the motion picture industry. But as the lamps employing the low intensity arc were economical in cost of maintenance and operation, they were generally used at this time in the smaller motion picture theatres.

In the high intensity arc, the carbons used were smaller, running from 8½ or 9 millimeters to 16 millimeters in diameter for the positive carbon, which was cored with a mixture containing metal salts capable of giving off a distinctly luminescent flame. In order to get best results it was found desirable to set the carbons at an angle to each other, and to cause the positive carbon to be rotated so as to prevent uneven burning and to give a steady flame. A much stronger current was used, i.e., a current of 70 to 75 amperes with a 9 millimeter positive carbon. The greater current produced a positive gas which was substantially confined to the crater of the positive carbon and burned with an intense white flame. The method was much more expensive, since a particular form of housing and mechanism were required on account of the angular disposition of the carbons and the rotation of the positive carbon, and since there was a greatly increased consumption of current.

The stated object of the patent is to provide a method of producing a high intensity arc that will retain the intense white light of former high intensity arcs, but can be used with greater economy by reason of low carbon consumption, low maintenance cost and low cost of operation. The patent proposes to accomplish this result by the use of a smaller positive carbon cored with a material capable of producing a brilliant gaseous positive flame, and still smaller negative carbon with a core of arc sustaining material. In an example given in the patent, the carbons are disposed coaxially with an arc gap of ¼". The positive carbon is not rotated. The current is comparatively small, in volume, e.g., as low as 40 to 65 amperes, with a 7 millimeter positive carbon and a 6 millimeter negative carbon, the best results being obtained with such a trim by the use of 46 amperes and 36 volts; but the proposed method is not limited to this particular apparatus. The current density is high, and a positive flame is produced which is met by the negative flame; and the amperage and voltage of the current and the arc gap are so arranged that the negative flame is not permitted to come in contact with the positive carbon. That carbon is shielded by the positive flame which is flattened out by the contact with the negative flame adjacent to the crater of the positive carbon, so that the positive flame appears outside the crater as a disc like concentric luminescent area that extends rearwardly and surrounds the end of the positive carbon.

The appellee relies particularly upon claims 1, 5 and 6 of the patent. Claim 6, which may be regarded as typical, is as follows: "6. The method of producing an electric arc which comprises positioning a positive electrode, capable of emitting a positive flame of luminescent gas, adjacent a negative electrode and substantially coaxial therewith, causing a current to flow between said electrodes sufficient to form said luminescent flame and a negative flame, directing said negative flame against said positive flame in such a manner as to form a crater in said positive electrode and substantially flatten a portion of said luminescent flame so as to form a substantially flattened luminescent surface in front of the crater, whereby the area of the crater is substantially completely covered by said flattened portion of said luminescent flame and said luminescent gas contacts substantially the entire area of said crater".

Projector lamps produced in accordance with the principles of the patent by a manufacturing corporation controlled by the patentee came on the market in July, 1933. Since that time many lamps produced by this and other manufacturers, embodying the general principles of the patent whether infringing the claims thereof or not, have had wide acceptance in the motion picture industry because they combine the beneficial effects of the former high intensity arc lamps with low consumption costs. The important question in the case is whether this accomplishment was brought about by the disclosures of the patent.

The evidence is undisputed that the activities which led to the development of the new high intensity arc originated with the National Carbon Company more than a year before Ashcraft produced his first lamp embodying the principles of the patent, and nearly two years before he applied for the patent. On May 25, 1932, in a letter from the sales to the manufacturing division of the National Carbon Company, it was pointed out that a growing demand had arisen for a trim of high intensity carbons for use in a reflecting arc lamp operating at 45–55 amperes at the arc, which would fill the gap between the then existing low intensity reflecting arc lamp, operated at 20 to 35 amperes, and the high intensity lamp operated from 60 to 85 amperes. Business conditions were at a low ebb at this time. The low intensity lamp had proved unsatisfactory to the trade, and the sales had fallen to the minimum; and at the same time there was little or no sale for the high intensity lamp in use at the larger theatres, because it was expensive both in cost of maintenance and of operation. Accordingly, the Fostoria factory of the National Carbon Company at Cleveland was directed by the management to develop suitable carbons of comparatively small cross section, to be burned at high current densities, with the positive carbon in a stationary position. It was shown by the factory in a letter of June 10, 1932, that such equipment would be cheaper than the existing high intensity lamp both in the cost of the lamp and in the cost of operation, and that it would provide a whiter and more powerful light than the well known low intensity lamp. Variations in carbon size, core diameter and core chemical impregnation to arrive at the best combinations were indicated, and it was said that the lamp manufacturers were willing to cooperate in the investigation.

As a result, experimental work took place not only at the Fostoria factory but also in the plants of various lamp manufacturers to whom the company sent sample carbons which it had specially designed to meet the object in view. The lamp manufacturers' tests were frequently witnessed by experts of the Carbon Company. It is now generally agreed that if the specially prepared carbons of the National Carbon Company are used in an arrangement which specifies carbons of certain sizes, coaxially disposed, the positive carbon being held stationary, and a short arc gap and a direct current of certain amperage and voltage, an arc is created which, if used in a motion picture projection lamp, will accomplish the results that the National Carbon Company set out to produce in its factory in 1932, and the patentee claims to have accomplished in 1933. Practical experience has also shown that the effectiveness of the arc in motion picture projection is improved by the use of a magnet above the arc, which attracts and gives greater steadiness to the flame. The use of the magnet was old in the art; but the patent does not mention it. The trade name "Suprex" has been adopted and is in general use as indicating suitable carbons for the new high intensity lamp; and the lamps themselves are sometimes called Suprex lamps.

Among other combinations, the following trims of carbons and current value will produce the desired results:

| Positive Carbon | Negative Carbon | Amperes | Voltage* |
|---|---|---|---|
| 6 mms. | 5 mms. | 35–40 | 35–40 |
| 7 mms. | 6 mms. | 45–50 | 40–40 |
| 8 mms. | 7 mms. | 60–65 | 40–45 |

The records of the National Carbon Company and correspondence between it and lamp manufacturers show, that as early as September 1, 1932, experimental work took place with carbons of these dimensions employed with currents of these values; that on September 15, the Fostoria factory computed the cost of production of small sized high intensity copper coated core carbons of the dimensions given in the above table; that during the latter part of 1932 and the early part of 1933, that is, in October, November and January, and in the spring of 1933, many dozens of carbons were sent to leading lamp manufacturers and tested. Tests were also made at Fostoria. The carbons were placed coaxially; the positive carbon was not rotated; an arc gap of ¼" was tried. The tests included carbons of the Suprex dimensions, under the amperages and voltages specified in the table. Certain of these sample carbons were preserv-

* The voltages vary in different tables. Ashcraft gave no range in his patent or in his catalogue, and in his testimony solely gave a range for the 6-5 trim. The voltages now in practical use are approximately 5 volts below the voltages recommended by the Carbon Company in 1932 and 1933.

ed and were produced at the hearing in the District Court and demonstrations were given which showed that they were effective to produce the results specified in the patent.

It must not be supposed that all of the carbons used in these tests in 1932 and 1933 were Suprex carbons. Carbons of larger size with appropriate amperages and voltages were also tested; and some of them ultimately proved not to be useful for the indicated purpose. But it is clear that the National Carbon Company furnished to the lamp manufacturers, that is, persons skilled in the art, essential materials and general instructions from which by ordinary experiment the combination best suited to the end in view could be found. Such progress had been made on February 27, 1933 that the National Carbon Company ordered the production of 23,000 carbons, that is, 20,000 positive carbons, and 3,000 negative carbons, of the sizes listed in the table.

Mrs. Ashcraft, the wife of the patentee and the assignee of the patent, was given a demonstration at Fostoria on November 1, 1932. A letter was written to Ashcraft at this time and samples of carbons within the Suprex limits, together with other carbons, were sent to him. The letter referred to experiments with alternating current and with direct current. At that time Ashcraft was chiefly interested in the development of lamps actuated by alternating current, and until his experiments on this line had failed to produce results, he did not begin the tests with direct current that led to a successful commercial lamp. He testified that he made his discovery on February 22, 1933 (also stated in the testimony as March 22, 1933). On that day he noticed for the first time that the positive flame in an arc assumed a halo appearance in advance of the crater at the end of the positive carbon under certain conditions. He found these conditions to exist when the voltage was not so great as to cause the negative flame to break through the halo and come into contact with the positive carbon. By experiment he found that with an amperage between 46 to 48, and a voltage of 36 to 38, a protecting disc would be formed. He also testified that he made a model for the production of the arc in March, 1933, and that he sold his first lamp which involved the principle of the patent on or about July 15, 1933.

The earliest date of discovery prior to the filing date of the patent, which is supported by corroborating testimony, is May 22, 1933, when Ashcraft wrote to one Dolliver, a lamp distributor, describing the completion of the Ashcraft lamp. This was followed by a demonstration in July and sales later in the month. In the meantime, Dolliver had secured samples of the new direct current carbons designed by the National Carbon Company from one Preddy, a competitor of Ashcraft, and had made satisfactory tests. Preddy himself produced a lamp with the new carbons on or about August 1.

Ashcraft claims to be the first person to comprehend the nature of the flame developed in the intermediate high intensity arc; and the evidence indicates that he was the first to produce a commercial lamp involving the principles of the patent. It may also be that he was the first to discover the limits of carbon size, amperage, voltage and arc gap with which the best results can be obtained. But it does not follow that he was an inventor. He is not in the position of one who takes the last important step in the solution of a problem which has proved too hard for the ordinary skilled worker in an art. The problem in the pending case was proposed, the carbons were designed, and the general bearing of amperage, voltage, coaxial arrangement and arc gap were disclosed by National Carbon Company to the general lamp manufacturing public in the latter part of 1932. All that Ashcraft did was to use the carbons in the manner recommended, and to select the arrangement best suited to fill the gap between high intensity and low intensity lamps. It was at most a matter of patient experimentation to find the answer; and the grant of the monopoly of a patent to the first finder would confer upon mere diligence the reward that the statute reserves to invention. Berlin Mills Co. v. Proctor & Gamble Co., 254 U.S. 156, 166, 41 S.Ct. 75, 65 L.Ed. 196; Atlantic Works v. Brady, 107 U.S. 192, 199, 2 S.Ct. 225, 27 L.Ed. 438.

Much stress is placed by the patentee upon the great commercial success of the projection lamps embodying the new arc that came on the market in 1933; and upon an article published in October, 1933 by David B. Joy, an official of the National Carbon Company, and the expert in charge of its tests of the new carbons, wherein

832

the advantages of the new process were described; and upon the fact that two rival lamp manufacturers took licenses under the Ashcraft patent and agreed therein to pay the patentee $5 on each lamp made and distributed by them at a net cost of approximately $220, so long as the patent should not be infringed by others. These circumstances would be of great weight if the question of validity of the patent in the light of the prior art were in doubt; but they are without significance when, as here, it is clearly shown that the patentee's achievement did not amount to invention. Toledo Pressed Steel Co. v. Standard Parts, 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334. Having reached this conclusion, we have no occasion to consider the bearing of the prior art as disclosed in patents Nos. 1,227,-210 and 1,357,827 to Sperry, or to consider the question of infringement.

The decree of the District Court is affirmed.