## ASHCRAFT v. NATIONAL THEATRE SUPPLY CO. et al.

### No. 2445.

District Court, D. Maryland.
Nov. 18, 1938.

Cook & Markell, of Baltimore, Md. (Charles Markell, Jr., of Baltimore, Md.), and Darby & Darby, of New York City (Samuel E. Darby and Floyd H. Crews, both of New York City), for plaintiff.

J. Calvin Carney, of Baltimore, Md., and Watson, Bristol, Johnson & Leavenworth, of New York City (L. A. Watson, C. V. Johnson, and E. R. Helferich, all of New York City), for defendants.

WILLIAM C. COLEMAN, District Judge:

This is a patent infringement case involving patent to C. S. Ashcraft, No. 1,983,-430, filed April 16th, 1934 and issued December 4th, 1934, relating to an electric arc and a method of producing it, used principally in motion picture projectors and search lights. One of the defendants, National Theatre Supply Company, is a seller, and the other defendant, the Grand Company—owner and operator of a motion picture theatre—is a purchaser of an arc lamp alleged to infringe the patent.

The plaintiff's rights in the patent and the jurisdictional prerequisites are established. The defences to the suit are the usual ones: (1) Non-infringement, and (2) invalidity of the patent on grounds, hereinafter specifically referred to.

Broadly speaking, lamps for the projection of moving pictures may be divided into two classes: First, those with low intensity arcs, and second, those with high intensity arcs. Again, these two types may be broadly differentiated by saying that the low intensity arc is produced by pure carbon electrodes which do not contain cores of arc-sustaining material; that it has a great economy and low maintenance cost, but that it gives a yellowish white light, whereas the high intensity arc is produced by carbon electrodes having cores of arc-sustaining material, and it gives a snow white light generally considered more desirable for the projection of motion pictures, although its initial and maintenance costs are much greater than those of the low intensity arc, because of greater carbon and power consumption.

The electric arc or flame is produced by sending an electric current of suitable voltage through a pair of carbons, one a positive, the other a negative electrode, which are placed with their ends adjacent to each other, thus producing a flame between these ends. Since the earliest days of the art, the light emitted from the positive crater of a carbon arc was known to possess the highest intrinsic brilliancy or candle power per unit area of any incandescent light source.

Up to the time of the issuance of the Ashcraft patent, while both alternating and direct current had been used in connection with various types of arcs falling within the broad classification just mentioned, the one commercially most attractive was a high intensity alternating current arc which gave better screen illumination than low intensity arcs, making available to the smaller theatre a white light, very similar to that obtained from the direct current high intensity arcs. Ashcraft, however, pointed out certain disadvantages that still existed in the high intensity arc, describing them as follows in his patent: "In the first place, the maintenance costs are very high. Due to high amperage and voltage the carbons burn very rapidly, and, furthermore, there is a rela-

tively high cost in the replacement of parts which quickly deteriorate due to the high intensity operating conditions of such arc. Furthermore, the operating costs are relatively high by reason of a high power consumption. Although this so-called high intensity arc produces good illumination, the light is of a bluish white color which is better adapted for motion-picture projection work than the yellowish colored light produced by the so-called low intensity arc, it is not, however, the most satisfactory light." He claimed that he had overcome these disadvantages in that he had discovered "a method of producing and operating a so-called high intensity electric arc in which excellent illumination or light intensity is attained, in which there is great economy by reason of low carbon consumption, in which the maintenance costs are low because the replacement of parts is less frequent, in which the operating costs are low due to a relatively low power consumption, and in which the light produced thereby is of a pure white color."

The patent contains numerous other separate statements of the various objects of the Ashcraft invention which need not be quoted, because largely paraphrasing each other. Suffice it to quote the following which perhaps best of all describes, in a brief way, the characteristics of the electric arc, produced by the method prescribed in the patent: "Another object of my invention is to provide a method of producing an electric arc in which a negative flame is directed against a positive flame to produce a body of luminescent gas having a substantially flattened surface and having its periphery extending rearwardly and surrounding the end of the positive electrode." The term "luminescent gas" is defined in the patent as meaning any gas giving a brilliant flame and includes a gas in which incandescent particles may be present.

The carbons called for are preferably copper coated, the positive carbon having a core composed of a material which during operation produces a brilliant, gaseous flame; and the negative carbon having a core of arc-sustaining material. The positive carbon is preferably 7 mm. and the negative carbon 6 mm. in diameter, the two being placed in *axial* alignment, that is, parallel with each other, the distance between their ends being maintained at approximately one-quarter of an inch. The specifications recite that best results are to be obtained with a current of 46 amperes

and a gap voltage of 36 volts, although the range of current is stated as low as 40 and as high as 65 amperes.

While all of the twelve claims of the patent are here in suit, plaintiff relies primarily upon Nos. 1, 5 and 6. They are all method claims and we here quote claim 6 as being typical: "The method of producing an electric arc which comprises positioning a positive electrode, capable of emitting a positive flame of luminescent gas, adjacent a negative electrode and substantially coaxial therewith, causing a current to flow between said electrodes sufficient to form said luminescent flame and a negative flame, directing said negative flame against said positive flame in such a manner as to form a crater in said positive electrode and substantially flatten a portion of said luminescent flame so as to form a substantially flattened luminescent surface in front of the crater, whereby the area of the crater is substantially completely covered by said flattened portion of said luminescent flame and said luminescent gas contacts substantially the entire area of said crater."

Shorn of technical language and considered in the light of the single drawing attached to the patent, it appears that the alleged invention of Ashcraft lies in the fact, as he claims, that he was the first to conceive of a combination of the various factors in electric arc production, whereby the flame from the negative carbon would be so impinged upon the flame from the positive carbon as to build up on the face of the latter a shield of luminescent gas, the negative flame pressure being gradually built up to a point where the positive flame is flattened into a disc, surrounding the end of the positive carbon. That is to say, this flattening of the positive flame or luminescent gas, flowing out of the crater at the end of the positive carbon, is claimed to be beneficial, in that this disc of luminescent gas forms a distinct polarized shield which prevents the flame from the negative carbon from flowing past the crater face of the positive carbon and enveloping the end of this carbon. The principal commercial advantages claimed by Ashcraft for his invention are great economy due to lower power and carbon consumption; elimination of complicated and expensive carbon and current feeding mechanisms which were involved in the method of rotating the positive carbon, which had been commonly adopted; and production of a more even field of light upon the screen. The great commercial suc-

cess of this type of arc was not refuted by any testimony in the present case. 90% of all of the motion picture projector lamps now sold in the United States have it, including those distributed under licenses from Ashcraft; as do 60% of all such lamps used elsewhere, although mostly produced with the addition of a magnet, hereinafter discussed.

### The Question of Validity.

Since the defendants contest the validity of the Ashcraft patent, it is appropriate to consider this question first, because if the patent be invalid, it becomes unnecessary to adjudicate the question of infringement.

Defendants assert that the Ashcraft patent is invalid because anticipated by (1) prior patents, (2) prior knowledge and use. Ashcraft's testimony is to the effect that he first conceived his idea on February 22nd, 1933; and that he first reduced it to practice on March 10th, 1933.

First, as to alleged anticipation by prior patents, defendants rely upon four such patents: To Heinrich Beck, No. 1,029,787, issued June 18th, 1912, on application filed December 12th, 1911; No. 1,086,311 also to Beck, issued February 3rd, 1914, on application filed November 22nd, 1913; to Elmer A. Sperry, No. 1,227,210, issued May 22nd, 1917, on application filed June 28th, 1915, and No. 1,357,827 to the same person, issued November 2nd, 1920, on application filed December 22nd, 1915.

The Beck patents, the later of which is an improvement upon the earlier, while closely approaching the idea dominant in Ashcraft, do not actually disclose this idea, namely, the shield or flattened disc of luminescent gas across the end of the positive carbon. Beck states that the primary object of his earlier invention is to improve the output of light "By forming an intensely luminous positive crater which is as small as possible." In his later patent, he concentrates upon means "which will deflect the arc flame proceeding from the negative electrode from the crater of the positive electrode," so that "the current shall emerge essentially at the front end of the positive electrode." Both of the Beck patents specify, as preferable, the rotation of the positive carbon.

Turning to the Sperry patents, we find that the first one approaches quite closely the dominant idea of Ashcraft. Sperry states in his patent that the success of his invention depends upon the proper utiliza-tion of the negative flame in combination with "first, the intensely luminous positive flame, second, the deep positive crater, which is used as the container for this luminous flame, the negative flame or blast being employed to impinge against and thus confine the luminous flame substantially in its entirety to the crater." He further states that "in order to use this directed negative blast so that it may confine the positive flame to the best advantage, I find it necessary to cause a definite impinging contact between the two flames across the crater mouth in such a manner that a steady and somewhat upwardly inclined current is created at the contact of the two flames. This sort of impingement still allows a steady, but not too free, escape of some of the spent positive luminous vapor in a constant direction and thus prevents flaring and flickering of the arc which results when the flame from the positive crater is allowed to escape in any undetermined direction, as it is necessary that it remain under perfect control by the negative flame." Indeed, it is difficult to distinguish, except in degree, the characteristics of the positive flame as illustrated in the drawings which accompany Sperry, from those claimed by Ashcraft for his invention. The later Sperry patent embraces certain improvements over the former "whereby the forming of a deep crater in the positive electrode which is very essential to the successful production of my arc, is rendered more certain." Sperry further states that "while studying the possibility of employing the white flaming arc for projector work I discovered an entirely new and paradoxical result. Very high grade, homogeneous, white flaming, solid, positive electrodes were employed in which the flame materials were baked in the carbons. * * * I conceived the idea that if this super-brilliant flame could be rendered stable and properly controlled or confined, that a source of light would be produced which would be much superior to the pure carbon arc." Continuing, he says: "In order to use this direct negative blast so that it may confine the positive flame to the best advantage, I find it necessary to cause a definite impinging contact between the two flames across the crater mouth in such a manner as to utilize the broad zone of the negative flame so that it entirely covers the mouth of the positive crater and thereby serves to impinge the whole body of positive vapor, not allowing it to issue at either side."

The illustrative drawings accompanying this later Sperry patent, studied in connection with the specifications and claims, disclose, substantially, Ashcraft's idea. It is true that Sperry's preferred method is to position the negative carbon at an angle to the positive carbon instead of having the carbons positioned co-axially; and also, Sperry contemplates rotation of the positive carbon. However, neither of these conditions is inflexibly prescribed and even if it were, later abandonment in a device otherwise the same, would not amount to a material difference. It is also true that Sperry emphasizes confining the positive flame to the crater, and says that "If allowed to escape at all it should be directed from the crater in a certain definite direction preferably upwardly at the top of the crater. This will confine the burning position of the shell to a comparatively small portion of the rim or lip." But, continuing he says: "The velocity and pressure of the positive flame is also of great importance, since this flame should on the one hand not be strong enough to push into or through the negative flame and on the other hand it should be strong enough to push its way out at least to the mouth of the crater so as to secure the important function of light saturation above pointed out with regard to this flame so that it may obscure to the proper extent the lower light intensity of the crater surface lying behind it. After many experiments, I determined that the velocity of the positive flame was a function of the current density, illustrating how the positive flame can be made to even push its way through the high velocity stream of the negative flame. It therefore appears that I have discovered a simple and dependable method of controlling the relative velocity of the two flames, and hence the depth of the positive, namely by varying the total current flowing and the current density in the positive electrode." Ashcraft says the same thing in effect: "In practicing my invention, I find that the current density must be high enough to produce the luminescent gas in a volume which will issue from the crater and at the same time must be below the point where the pressure of the negative flame against the positive flame will tend to break through or destroy the luminescent disc."

■ We do not lose sight of the fact that Sperry, contrary to Ashcraft, specifies, in order to obtain most successful operation, a high amperage (about 150 amperes) coupled with high current density in the positive electrodes (about 500 amperes per square inch); also, a very much larger arc gap— from ⅞ to 1 inch. Furthermore, we recognize that Sperry, in this later patent of his, describes it as a "method of operating electrodes for search-lights," and no mention is made of its application to moving-picture projectors (although his earlier patent was for flaming arc lights for projectors generally); and also that at the time when both of the Sperry patents were applied for, June and December 1915, respectively (nearly 19 years before the Ashcraft application), moving picture projection was in its infancy. However, both Sperry and Ashcraft are specific in permitting a wide range of formulas, and it would seem that the former has disclosed the principle of the latter, although inferior in perfection and utility. In short, we believe that Ashcraft has done no more than display the routine ingenuity of a craftsman in this particular art, having before him the Sperry disclosure. If so, this is not invention. The creation and maintenance of the so-called shield of the positive flame, which, as we have seen, is claimed to be the crux of the Ashcraft idea, is but a slight variation of the same flame in Sperry, depending upon variation in current densities and positioning of the carbons.

■ We are thus led to the conclusion that the later Sperry patent does anticipate Ashcraft. All four of these alleged anticipating patents were cited to the Patent Office in the course of its consideration of the Ashcraft invention, and all apparently were rejected as non-anticipatory. We say apparently, because nothing is to be found in the Patent Office file-wrapper indicative of the precise reason for the rejection. We conclude that due weight was not given to the later Sperry patent, and although a presumption arises in favor of the validity of a patent, by reason of its issuance, this is only a prima facie presumption and, therefore, capable of being overcome by clear evidence of anticipation of the patent in one or more of the various ways provided in the patent law. 35 U.S.C.A. § 31.

It does not appear that the patent examiner witnessed any actual demonstrations of the patented device, whereas this Court had the benefit of numerous prolonged demonstrations. Indeed, it is not apparent to this Court how a satisfactory comparison of the arcs created by the respective lamps could be made without seeing the arcs with

the naked eye; or at least without so seeing the reflected images of such arcs. This Court spent several hours witnessing such demonstrations in a specially arranged exhibition room. Plaintiff and defendants were afforded, in turn, and always in the presence of counsel and technical experts for both, extended opportunity to operate their lamps under all desired voltages and amperages. Throughout all of these demonstrations, the Court was not only able to look through the opaque glass windows with which the various machines were equipped for the purpose of seeing the flames, but, at the special request of the Court, each flame in each demonstration was reflected, with considerable magnification, upon a special screen of white drawing paper, and immediate tracings made of the outlines of the flame and all related factors. As a result, there are in the case a score or more of actual reproductions of the shape of both the negative and positive flames produced by each demonstration. Furthermore, neither side can be heard to say with respect to opposing drawings that they are inaccurate, or not what they purport to be, because the Court not only witnessed the reflection on the special screen of the images of the flames and the carbons, but was jealous to see that the tracings of the same were all made while the images persisted, and if any corrections were necessary or called for, they were required to be made at the moment.

Even if it be assumed that the Sperry patent No. 1,357,827 is not a complete anticipation of Ashcraft, we believe there is no doubt whatsoever that Ashcraft was anticipated prior to 1930 by the so-called Peerless Hi-Lo Arc Lamp, whose arc was reflected and traced as above explained.

It is undisputed that this Peerless lamp was used as early as 1926. The demonstration was with 52 volts, 75 amperes. While not within the range specified in the Ashcraft patent for making the Ashcraft arc operative with the best results, variations up or down from such specifications in Ashcraft are not to be treated as material, any more than is a variation from the Ashcraft specifications in the type or size of either the positive or negative carbons, or some variation in the width of the arc-gap as there prescribed, to be treated as a material difference. In short, these are all variable factors, the question being solely whether anyone had anticipated Ashcraft in the production of the shield or flattened disc of luminescent gas across the face of the crater of the positive carbon which is, as we have seen, the crux of his invention. When we examine the Peerless Hi-Lo Arc Lamp as disclosed by the tracings of the images of the flames cast upon the screen when this lamp was under demonstration, without a magnet (the effect of which is hereinafter discussed under the heading of "Infringement"), we find the shape of the positive flame and its relation to the end of the positive carbon, as well as the shape of the negative flame and its relation to the positive flame and the positive carbon, to be substantially the same as in the corresponding demonstrations of the Ashcraft patented arc, also without a magnet. It is true that the negative carbon in the Peerless lamp was operated at an angle, that is, not co-axially with the positive carbon. It is also true that the positive carbon was rotated. However, we believe that the latter is not a material difference and is so conceded by counsel for plaintiff. As to the difference in position of the negative carbon, we, likewise, find that this is not a vital variance, because such varying of the position of the negative carbon was old in the art and, as we have seen, is definitely covered by the patents to both Beck and Sperry.

It is true that in the Ashcraft lamp, particularly in the early type of the so-called Suprex lamp, the positive flame, when operated without a magnet, enveloped the bottom as well as the top end of the crater of the positive carbon, and the same occurred but with less degree in the later model of the Ashcraft Suprex lamp; although this condition was considerably modified when the lamp was operated with a magnet. However, under both conditions, and with respect to both the old and the new Ashcraft type of lamp as compared with the early Hi-Lo intensity Peerless just referred to, we believe that this dropping of the positive flame does not amount to a material difference, particularly since the use of a magnet, as will hereinafter be explained, is not believed to be a vital change, but merely a permissive, well known adjunct, employed merely for the purpose of obtaining more perfect results, without altering any basic principle in either the means or the method of operation. As a matter of fact, the Ashcraft specifications, as well as the drawings, indicate that the periphery of the end or crater of the positive carbon is surrounded, and advantageously so, by the positive flame. The specifications provide that "the peripheral portion, when conditions are most desirable, is forced rear-

wardly as at 24 so as to surround the end of the positive carbon, and is useful in adding heat to the end of the positive carbon so as to produce an isothermal condition in the walls forming the crater. This is of assistance in producing an evenly distributed issuance of luminescent gas from the crater."

A further fact, which is most corroborative of anticipation is that Mr. Ashcraft, when, as a witness, he was shown a tracing made of the Hi-Lo lamp arc during one of the demonstrations, and was asked if it represented an arc such as the process of his patent called for, replied that it did. In short, Mr. Ashcraft could not, or at least did not, distinguish the arc of the prior art lamp from his own. It is also significant that plaintiff, unlike the defendants, produced as a witness no expert on the prior art patents.

■ Anticipation may be sufficient. in law even though the earlier device does not work as well as the patented device, provided, the former is operable and has attained the same general result. That is to say, whether the prior inventor knew fully and precisely the scientific principles involved in the procedure used in his invention is immaterial, it being sufficient that the prior inventor knew and used the same method with operative success. This is but another way of saying it matters not if the prior inventor's approach to or use of the method was not as skillful, it being sufficient if he attained the same results, knew that he did, and used them. Accidental use is, of course, not sufficient if earlier practitioner was not aware of what he was doing or how he did it. See De Forest Radio Co. v. General Electric Co., 283 U.S. 664, 686, 51 S.Ct. 563, 75 L.Ed. 1339; Smith v. Hall, 301 U.S. 216, 226, 227, 57 S.Ct. 711, 81 L.Ed. 1049; McKee v. Graton & Knight Co., 4 Cir., 87 F.2d 262, 264; Regar & Sons, Inc., v. Scott & Williams, Inc., 2 Cir., 63 F.2d 229, 231; A. B. Dick Co. v. Simplicator Corp., 2 Cir., 34 F.2d 935, 940.

In view of our conclusion that Ashcraft was anticipated by several years by the Peerless Hi-Lo Lamp, it is not necessary to analyze the testimony produced on behalf of defendants, in their efforts to prove that Ashcraft was also anticipated by the prior knowledge and use on the part of the National Carbon Company of the Ashcraft flame, in the course of its development of various high intensity carbons. However,

we will summarize our views with respect thereto.

■ Plaintiff maintains that what the National Carbon Company did amounted to no more than mere experiments, laboratory investigations. We are inclined to this latter view because it appears from correspondence which lamp manufacturers had with the National Carbon Company as late as January 24th, 1933, that this company considered the filling of the gap between the low intensity and the high intensity arc lamps for use in direct current projection, still in the experimental stage. And this conclusion is not inconsistent with the fact, as appears from the testimony in the present case, that on or about February 7th, 1933, that is, two weeks ahead of the conception date of Ashcraft's invention, the National Carbon Company believed the matter was sufficiently far advanced to start the production of some 23,000 carbons of the various types that had been experimented with, including the precise types. and sizes for use with the amperages and voltages prescribed by Ashcraft. The mere prior accidental production of the same thing as a patent produces, if the character and functions of the thing are not actually recognized, does not amount to anticipation, and we feel that that was the situation with respect to the National Carbon Company, separately considered. See McKee v. Graton & Knight Co., supra.

■ In conclusion, therefore, with respect to the question of validity, we find that the patent in suit to Ashcraft is invalid as to all claims, because of anticipation as early as 1926 by the Peerless Hi-Lo Arc Lamp.

### Infringement.

Having found the patent to Ashcraft to be invalid, it becomes unnecessary to determine whether the defendants' lamp has infringed it. However, since the question of infringement, as we view it, turns upon a narrow and relatively simple question, namely, the effect of the use of a magnet in this type of arc lamp for the purpose of stabilizing the arc, we deem it appropriate to pass upon this question also.

A comparison of the shapes of the positive flames, as disclosed in the demonstrations witnessed by the Court and transcribed into the form of drawings, shows unquestionably that, to the naked eye, there is no apparent difference in the general characteristics of the location and shape of the positive flame produced by the Ashcraft lamp

and the defendants' so-called "Magnarc" lamp when each employs a magnet and is operated with the same, or relatively the same, carbons and amperages and voltages. The question then becomes a threefold one: First, what does the introduction of the magnet do to the Ashcraft positive flame? Second, does the effect so produced create any material difference in the flame's characteristics? Third, is the use of the magnet to be treated as lying outside of the prescribed limits, expressed or implied, of the Ashcraft patent?

Taking up these questions in the order stated, it is undisputed that the intended and produced effect of the introduction of the magnet is to stabilize the arc. In lamps with a rotating positive carbon, it was customary to burn the arc with the negative carbon set at an angle of more than 90° but less than 180°, to the positive carbon; that is, without the two carbons being directly in line. This, together with the natural flow of the arc stream, projected the tail flame of the arc in an upward and forward direction from the positive carbon crater. However, in lamps of the Ashcraft type, that is, those burning smaller, high intensity, non-rotating positive carbons, with the negative and positive carbons directly in line, the lines of force generated by the arc current are distributed uniformly about the carbons and there is no resultant force in an upward direction except such as may be caused by natural drafts in the lamp. The tail flame, therefore, surrounds the arc in almost a uniform layer. Unless the lamp is designed so as to eliminate extraneous drafts or other disturbing factors, any slight misalignment of the carbons will cause the crater of the positive carbon to burn away on one side, resulting in a noticeable change in the depth of the crater and in the stability of the light. To offset this, a magnetic flux by means of a magnet is used to increase the flux density below the arc and decrease it above. This flux from the magnet is in such a direction as to tend to neutralize the flux above the arc generated by the arc current and to increase the total flux below the arc, with the result that the tail flame from the arc lengthens and is driven upward, becoming comparatively stable and constant in length and direction. Then, if the negative carbon is lowered slightly to compensate for this direction of the arc stream, the tendency for the crater to burn off in any direction is overcome.

Whenever the magnet was employed, whether in the Ashcraft or in the defendants' lamps, the demonstrations indicate beyond contradiction that the tail flame is drawn upward and a similar effect is produced upon the positive flame; whereas without the magnet, it has a tendency to bulge in front of the face of the positive carbon crater and to extend to the bottom edge of such crater and even around the entire periphery of such crater. When the magnet is employed it is flattened out and drawn upward and does not surround the lower edge of the positive carbon or if it does, at least not to a great extent.

We turn now to the second question, namely: Is this effect of the magnet upon the positive flame a materially different one in the light of the requirements of the Ashcraft patent? We conclude that it is not; that is to say, we do not believe it is reasonable to say that the change in the location and shape of the positive flame produced by the introduction of a magnet, as above explained, is to be treated as a change in the essential characteristics of this flame, because those characteristics of the flame, both as to its intended location and shape, remain. It is true that the effect of such auxiliary magnetic force upon both the flame and the resultant light on the screen is of real practical importance, but this is not tantamount to saying that the use of such magnetic force actually changes or defeats the basic idea of the arc created in the same lamp when operated without it. In short, we believe that the question is one largely of degree. This conclusion would seem to be strengthened by the fact that, as we have already seen in discussing the question of the validity of the Ashcraft patent, the early, so-called Peerless Hi-Lo Lamp which we have found anticipated the Ashcraft lamp, not only produced, without a magnet, a flame whose shape and characteristics were substantially identical with those of the Ashcraft lamp likewise operated without a magnet, but also, although the light steadiness curves of the Ashcraft lamp, when so operated, were not taken, such light curves of the Peerless Hi-Lo Lamp were recorded by the special, very delicate instrument provided for this purpose, which recording shows a very stable light, and thus it is to be assumed that the more modern and commercially successful Ashcraft lamp would at least produce a light curve chart not less satisfactory.

■ We come, then, to the third and last question which the introduction of the magnet raises, namely; Is the use of the magnet forbidden by the Ashcraft patent? We conclude that it is not. It is fundamental in the patent law that even though not actually provided for in the claims or specifications, those adjuncts may be introduced into the operation of the patent which are, in fact, no more than well known adjuncts at the time the patent invention was conceived and which do not, by their addition, materially change the operation and result of the patented device. Since, as we have found, neither the operation nor the result is materially changed, that is to say, since neither the manner in which the positive flame is produced, nor the result caused by the interposition of the magnet, is different from what it would be without the magnet, except that the magnet tends towards the production of a more uniform, more steady light, we conclude that the use of the magnet does not lie outside of the contemplation of the Ashcraft patent, especially since, as is clearly proven by the testimony in the present case, such use, for the very purposes for which Ashcraft adopted it, was well known in the art long prior to his first conception of his idea. In this latter connection, we need only refer to the reference to such use of the magnet in the article by D. B. Joy and A. C. Downs, officials of the National Carbon Company, the former a witness for the defendants in the present case, entitled "Direct-Current High Intensity Arcs with Non-rotating Positive Carbons," which was made public in the autumn of 1933; and to the fact that Joy, as early as November 18th, 1932, in one of his written reports concerning the results of laboratory tests, that he was conducting on behalf of his company, of high intensity, direct current, positive carbons of the type ultimately supplied to and used by Ashcraft in his patented lamp, stated it was anticipated that lamp manufacturers would probably use some kind of a magnet to stabilize the arc, and that, therefore, he had made preliminary tests in burning these carbons both with and without a magnet.

Defendants, however, assert that the shape of the flame when the magnet is used is not only to be treated as substantially different, but that Ashcraft should be denied its use as part of his patent because such use prevents the very type of flame which he specifies he must have. In support of this contention, defendants stress Ashcraft's affidavit before the Patent Office as found in the file wrapper. However, assuming, without deciding, that there may be some language contained in that affidavit which lends support to defendants' contention, we, nevertheless, believe, as has already been shown, that the patent claims and specifications are sufficiently broad to allow considerable latitude with respect to both the position and shape of the positive flame. When operated without the magnet, defendants' lamp has been shown to produce, both as to position and general characteristics, substantially the same positive flame as does the Ashcraft lamp operated under the same conditions. When each employ a magnet the flame produced is likewise found to be substantially the same, both as to position and general characteristics. Since the magnet has long been known in the art as a common means of stabilizing the flame, that is, of producing a more uniform, steadier and, therefore, a better light throughout this entire field of electric arc production, it seems wrong to say that defendants can, nevertheless, escape the charge of infringment merely by the use of such a commonly known and commonly employed device, and merely because plaintiff has failed to make any mention of it in his patent.

We are not unmindful of the fact that there is in evidence in this case part of an article, published in January 1935, by Messrs. Joy and Geib (both witnesses in the present case), in which it is stated that, by the use of the magnet, an upward force is established which materially changes the shape and characteristics of the arc. (See Journal of the Society of Motion Picture Engineers, January 1935, p. 60.) But this is apparently a general statement, not made with direct application to the precise combination of factors used in plaintiff's and defendants' lamps. At least, it does not seem to be supported by the actual demonstrations made to this Court when considered from the point of view of what, under the patent law, is to be taken as a "material change" in the art.

We thus conclude that, were it necessary to rest the present case upon the question of infringement, we should be compelled to find that plaintiff had sustained the burden imposed upon it of proving that infringement had occurred.

In view of our conclusions, it becomes unnecessary to consider the additional ground which defendants advance in support of their claim of non-infringement,

namely, that Ashcraft was guilty of misrepresentation (not, however, fraudulent misrepresentation) before the Patent Office while his application was pending.

In conclusion, the Court finds that all twelve claims of the patent in suit are invalid for anticipation and, therefore, the bill of complaint must be dismissed.

A decree will be signed in accordance with this opinion.