**FILTERITE CORPORATION, a body corporate of the State of Maryland**

v.

**TATE ENGINEERING, INC., and the Carborundum Company.**

**Civ. No. 19366.**

United States District Court,
D. Maryland.
Sept. 30, 1970.

Z. Townsend Parks, Parks, Parks & Schneider, Baltimore, Md., and Harry John Staas and Allen D. Brufsky, Brufsky, Staas, Breiner & Halsey, Washington, D. C., for plaintiff.

John W. Avirett, 2nd, Piper & Marbury, Baltimore, Md., and William H. Webb, William H. Logsdon, Webb, Burden, Robinson & Webb, Pittsburgh, Pa., for defendants.

FRANK A. KAUFMAN, District Judge.

This is an action for alleged infringement of United States Letters Patent No. 3,356,226, issued December 5, 1967, on an application filed on December 29, 1964 by Charles A. Miller, Jr., Joseph B. Masaschi and Robert W. Miller, Jr.

Plaintiff, Filterite Corporation (Filterite), the assignee of the patentees under an assignment dated March 20, 1968, is a Maryland corporation with its principal place of business at Timonium, Maryland, at which it is engaged in the manufacture and sale of filters and filter equipment. The original defendant, Tate Engineering, Inc. (Tate), is a Maryland corporation, having an established place of business in Baltimore, Maryland, operating, *inter alia*, as an independent distributor for products, including filters and filtration equipment, manufactured by the Carborundum Company and its predecessor, Commercial Filters Corporation. Carborundum Company (Carborundum), the intervenor-defendant, is a Delaware corporation, having a place of business at Niagara Falls, New York. Carborundum is engaged in the manufacture and sale of a wide variety of products, including filtering media, filters, and filtration equipment. Commercial Filters Corporation (CFC), formerly a New York corporation doing business in Indiana and elsewhere in the United States, was merged into Carborundum on or about

April 1, 1968. Since that date, Carborundum has engaged in the manufacture and sale of filters, including the accused filters—the so-called "Honeycomb filters"—formerly manufactured and sold by CFC.

Carborundum or its predecessor CFC have made and sold the Honeycomb filter since prior to December 5, 1967. Tate has sold the Honeycomb filter within the District of Maryland since prior to December 5, 1967.

Carborundum filed a counterclaim herein charging infringement by Filterite of United States Letters Patent No. 3,398,905, relating to certain "Apparatus for Making Filter Tubes." Carborundum subsequently voluntarily dismissed said claim with prejudice.

## FINDINGS OF FACT

### Technology of the Industry

The patent in the instant suit relates to a "single helically [1] wound filter unit," and contains only the following single claim:

A single helically wound filter unit, comprising in combination:

(a) an elongated rigid perforated tubular core;

(b) at least two filter tubular elements independently helically wound from fiber strands on said core, the helical windings of each of said strands being spaced apart to form channels extending through the filter tube element perpendicular to the core, said strands having independent fibers extending radially outwardly from the surface thereof and extending axially and circumferentially of the filter elements over the said channels with each layer of winding and outwardly beyond

the ends of the said filter tube elements;

(c) at least one of the ends of each of the filter tube elements being in abutted relationship with an end of an adjacent filter tube element, the ends of the fibers extending beyond the ends of each of the abutting filter tube elements being engaged and secured by the windings on the adjacent filter tube element to form a filtering area between the abutted ends thereof.

By 1964, the technology of the industry had progressed to the stage at which it was well known how to manufacture an adequate individual filter tube with a maximum length of ten inches. For a number of years prior to 1964, both Carborundum and its predecessor CFC, and Filterite had produced such a filter. Filters of this type are manufactured by winding rovings of textile or synthetic material in a helical pattern, in successive layers, about a perforated core from one end to the other as the core is rotated. The core is usually of a rigid nature. The helical wrapping causes the formation of a number of diamond-shaped openings extending from the core to the outer diameter of the filter tube. The rovings are fed from a supply bobbin to a rotating mandrel. During this wrapping, the roving in each layer about the core is napped by a "napping brush" which releases some fibers from the roving and lays the fibers across the rovings and the diamond-shaped openings.[2] This process is continued until a desired external diameter of wound roving is achieved. The diamond-shaped openings form filtering areas.

While the within dispute is set against the background of the above-discussed procedures and technology, it centers up-

---

1. "Helical" is defined in Webster's Third New International Dictionary (1966) as "of, relating to, or having the form of a helix: cylindrically spiral * * *."

2. The napping brush operates vertically in relationship to the core, though acceptable

filters can apparently be produced by horizontal napping. The differences caused by vertical as opposed to horizontal napping do not appear to be relevant or material in this case.

on the method employed in the coupling together of two or more of the filter tubes. For many years, there was a demand for filter tubes of a length longer than ten inches. However, the available machinery and techniques did not initially lend themselves to making a single tube of longer length. During World War II, CFC received many requests for filters longer than ten inches in length, and achieved that result by either gluing two or more filters together or by providing several small filters for stacking end to end with spacers between them. However, inherent in those methods was leakage, slippage or lack of provision of a filtering area at the point where the ends of the filters were either in contact with each other or were separated by spacers.[3]

In 1947 or 1948, CFC attempted to make a single filter tube that was longer than ten inches, and at that time developed a machine which utilized a single roving in making such a long tube in one continuous section. That machine produced filters 36 inches in length. However, those filters did not prove to be successful in operation, and such operation was soon discontinued.

Subsequently, in the early 1950's, James V. Piacitelli, then an employee of CFC, engaged in experimental winding and developed a machine for simultaneously winding two filters on a single mandrel. That machine operated by having two roving guides operating in unison, each supplying the roving to a different filter. Mr. Piacitelli observed that that process could, and in fact did once, result in the rovings of the separate filters beginning to interwind and overlap at the adjacent ends of the two filter sections. However, Mr. Piacitelli did not continue with work in that area since the purpose of his experimentation was to wind two independent filter tubes on one mandrel, and not to link together two or more filter tubes. CFC began to use machines similar to the one Mr. Piacitelli had developed, but in order to prevent such interwind, established a fixed linkage between the guides on the mandrel and a spacer between the filter tubes. Observations similar to those of Mr. Piacitelli, concerning the interwinding of two filters on a single mandrel, were made by several persons at CFC. However, there is evidence that at least some persons at CFC considered such interwinding to be undesirable. Throughout the 1950's, CFC sporadically experimented with and tested filter tubes longer than ten inches in length, but none proved to be successful.

In either 1961 or 1962, Mr. Piacitelli, continuing his experimentation at CFC, developed a machine for making a unitary, solid filter comprised of several filter tubes, with those tubes being linked by an interwinding of rovings at their adjacent ends. The individual tubes were placed on a single mandrel and were spaced so that there would be about a one-half inch gap between each tube between each tube before the winding began. As the winding of the roving progressed, the length of the tubes increased slightly (called the growth phenomena), so that there was about a one-fourth inch interwind on the completed tube. Several persons at CFC witnessed the operation.

Mr. Piacitelli did not conduct tests on those connected tubes except to give them a "twist test" which proved the integrity of the interwound joint between the ends of the filter tubes.

Neither Mr. Piacitelli nor anyone else at CFC continued with the production of such interwound filters until mid-1963, when the project was again started up. At that time, Mr. Piacitelli began to make changes in the machine he had made in 1961 or 1962. As a result, preparation for commercial production of such filter tubes at CFC began, perhaps as early as the latter part of 1964. While there is some conflict in the testimony, this Court finds that such production did not commence, and indeed was not scheduled to commence, at CFC until after

---

3. There was testimony that those methods are, to some extent, still in use today.

CFC learned from its customers of the availability of unitary tubes manufactured by Filterite with lengths in excess of ten inches and until after application had been filed for the patent in suit herein.

### The Patented Filters

In 1963–64, Messrs. Miller, Miller and Masaschi succeeded in producing a single, unitary filter and successfully applied for a patent on December 29, 1964.[4] That patent, here in suit, relates to a method of joining or coupling two or more filter sections together so as to provide a continuous filtering area with no leakage or slippage. The patent teaches that that result is achieved by napping the rovings so that the abutted ends of the two filter sections are tied together by the *fibers* of each section extending over the abutment and by those *fibers* being held in place by the *roving* of the adjacent section, and that the *fibers* from the two sections are joined in such a random pattern as to form a filtering area in the space between the abutted ends of the two filter sections. The patent in suit states:

> [T]hey [the fibers] extend beyond the end where they are intermingled with the fibers of the abutted end of the combination fiber element and [are] tied down by the strands of the wrappings of the opposite tube element. [Col. 3, lines 12–15]

Both the written description and the figures of the patent show joining of the two sections by intermingling of the fibers, and not by interwinding of the rovings. Filterite contends that anyone skilled in the art of producing filters would, or should, realize that the so-called growth phenomena would result first in an intermingling of fibers and then an interwinding of the rovings as the filter tubes received more and more layers of roving. However, the patent does not so specify. Also, while none of the products of either Filterite or Carborundum are so constructed, filter tubes can in fact be joined together by the mere intermingling of fibers. That result was demonstrated by Filterite in an experimental winding during the course of the trial of this case. But the exhibit so produced was the only exhibit which does disclose that result.

## OBVIOUSNESS OF SUBJECT MATTER

While a patent is presumed to be valid, 35 U.S.C. § 282, it still must meet the several statutory requirements established by Congress. Defendants have the burden of proving that the patent does not so pass muster. 35 U.S.C. § 103, which sets forth one of those tests, provides:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Plaintiffs contend that the usage of the word "abutment" in the patent application—

> requires at a minimum the touching relationship and includes logically and inherently by the nature of the winding process subsequent interwinding and overlapping of the roving reversals

4. CFC contends that Mr. Masaschi was the sole inventor and that neither of the Messrs. Miller was therefore a proper applicant for the issuance of the patent in suit. 35 U.S.C. § 102(f) provides that "[a] person shall be entitled to a patent unless * * * (f) he did not himself invent the subject matter sought to be patented * * *." This Court accepts the testimony of Messrs. Miller and Mr. Masaschi, finds that the three of them collaborated in the alleged invention covered by the patent, and holds that the patent is not invalid insofar as section 102 (f) is concerned.

at the ends of the adjacent filter elements. [Plaintiff's post-trial brief p. 4]

In Graham et al. v. John Deere Co. et al., 383 U.S. 1, at 17–18, 86 S.Ct. 684, at 694, 15 L.Ed.2d 545 (1966), the Court stated:

[T]he scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

■ Various patents granted prior to the patent in suit disclosed processes for the simultaneous winding of multiple filters. (See, e. g., Naumann Patent, No. 2,197,747). Further, the Gaulding Patent, No. 3,242,550, issued March 29, 1966, showed that adjacent tubes of yarn (for use in weaving) could be overlapped and interwound to form a smooth surface. Those prior patents indicate that it was obvious to those in the filter industry that two or more filters could be joined together by interwinding of the rovings. Moreover, the addition of the quality of providing a filtering area within that area of coupling is not of such significance as to render the patent nonobvious in nature. The patent does not proclaim the area of abutment to be a filtering area of *equal effectiveness for filtration* as the result of the filter; it only claims that there will be a "filtering area between the abutted ends. * * *" (Col. 4, lines 24–25). It was obvious to anyone in the industry that it was possible so to interwind the rovings of the adjacent filters so as to provide that there would be at least some filtration in the area of abutment. Nor, in this case, in view of such obviousness, do so-called "secondary considerations" referred to and enumerated in *Graham, supra*, marshal in their totality sufficient strength to save this patent from obviousness and thus from invalidity. *See* Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co., 332 F.2d 406, 414 (6th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964).

## INFRINGEMENT

Defendants contend that Filterite's *products* and the alleged offending filters feature *interwinding* of the rovings with regard to the joining together of the adjacent ends of the filter sections; and that the *patent* in suit (and the one trial demonstration exhibit, see p. 9, *supra*) feature the intermingling of the fibers with regard to the joining together of the adjacent ends of the filter sections. Accordingly, defendants take the position that if the Filterite *patent* is construed in accordance with defendants' position, the accused filters do not offend the specifications of the *patent* in suit.

## PLAINTIFF'S DILEMMA

■ Plaintiff in this case finds itself on the horns of a dilemma. If the patent is interpreted as Filterite contends, the patent falls afoul of the obviousness provision of section 103. On the other hand, if the Filterite patent is interpreted as defendants contend it should be, then defendants have not infringed upon the *patent*. Also, if the Filterite patent is interpreted as Filterite urges it should be, the patent runs afoul of the requirement of 35 U.S.C. § 112, which provides that the patent contain a—

written description of the invention * * * in such full, clear, concise, and *exact* terms as to enable any person skilled in the art to which it pertains * * * to make and use the same. [Emphasis added].

The patent in suit speaks only of the integration of "fibers," not of the rovings. (See, e. g., Fig. 4 in the patent). To put

it another way, the language of the patent does not provide for the interwinding of the rovings of adjacent filters in order to join the filters together. Thus, if the validity of the patent depends upon it calling for interwinding, and thus upon it covering more than its language claims, the patent is invalid under section 112. This Court holds that the patent claims and covers what its language and its pictures, e. g., Figure 4, disclose, namely, the integration of fibers and not the interwinding of rovings.

### 35 U.S.C. § 102(a) and (g)

■■ Defendants, relying chiefly on the testimony of Mr. Piacitelli, as supported by other witnesses, contend that the invention was known or used or made before the application for the patent in suit.[5] This Court does not question the truthfulness of Mr. Piacitelli. It does, however, harbor considerable doubt concerning the reliability of his diary and of his memory.[6] But even if such doubts are put aside, Mr. Piacitelli's testimony, taken in the light most favorable to defendants, does not satisfy the tests of sections 102(a) or 102(g). The "knowledge" required by section 102(a) involves some type of *public* disclosure and is not satisfied by knowledge of a single person, or of a few persons within the confines of one company. Soundscriber

Corp. v. United States, 360 F.2d 954, 960, 175 Ct.Cl. 644 (1966); Application of Borst, 345 F.2d 851, 854, 52 CCPA 1398 (1965), cert. denied, 382 U.S. 973, 86 S. Ct. 537, 15 L.Ed.2d 465 (1966). Mr. Piacitelli at no time disclosed his invention in such a way as to make it public. Also, Mr. Piacitelli's accidental achievement of a result, the importance of which he himself did not recognize or understand at the time, does not constitute prior anticipation of the patent in suit. Ashcraft v. National Theatre Supply Co., 25 F.Supp. 426, 432 (D.Md.1938), aff'd, 108 F.2d 828 (4th Cir. 1940). See Abbott v. Coe, 71 App.D.C. 195, 109 F.2d 449, 451 (1939). Further, neither Mr. Piacitelli nor anyone connected with CFC employed the procedure which Mr. Piacitelli observed to a degree which satisfies the requirements of prior use contained in section 102(a). See Deering v. Winona Harvester Works, 155 U.S. 286, 301–302, 15 S.Ct. 118, 39 L.Ed. 153 (1894); Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co., *supra*, 332 F.2d at 415.

Finally, Mr. Piacitelli's pre-1964 experiences do not meet the standards of section 102(g). Defendants have not satisfied their burden of showing that Mr. Piacitelli and CFC did not abandon the machine Mr. Piacitelli used in 1961–62 and did not wait until after the application for the patent in suit was made

5. 35 U.S.C. § 102(a) and (g) provide:
   A person shall be entitled to a patent unless—

   (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign county, before the invention thereof by the applicant for patent, or

   \*   \*   \*   \*   \*

   (g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was

first to conceive and last to reduce to practice, from a time prior to conception by the other.

6. Plaintiff has challenged the admissibility or use at the trial of the Piacitelli diary on the basis that it was neither kept contemporaneously or in the regular course of business. This Court is of the opinion that the diary was kept on a sufficiently contemporaneous basis in the regular course of business so as to render it admissible and usable at trial. But this Court, while it has no doubt concerning Mr. Piacitelli's intent to tell the truth in the diary and on the witness stand, does not attach any controlling weight to his diary or testimony in view of the confusion which is self-evident in both the diary and in his testimony.

on December 29, 1964 to revive their earlier achieved result.[7]

\* \* \*

Accordingly, this Court holds:

1. The patent is not invalid under 35 U.S.C. § 102(a), (b), (f) or (g).

2. If the patent is construed as Filterite contends it should be, it is invalid under both 35 U.S.C. §§ 103 and 112.

3. On the other hand, if the patent means what defendants say it means, then it is not infringed by the accused filters.

4. The patent means, in the opinion of this Court, what defendants say it means.

5. Therefore, judgment is hereby entered for defendants with costs.

7. Also, there is no basis for a successful challenge under 35 U.S.C. § 102(b), which provides:

A person shall be entitled to a patent unless—

\* \* \* \* \*

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, \* \* \*.